
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 14, 2016 Session

## STATE OF TENNESSEE v. JACOB PEARMAN

### Appeal from the Circuit Court for Rutherford County
No. F-71592    David M. Bragg, Judge

_____

### No. M2015-02271-CCA-R3-CD

_____

The Defendant-Appellant, Jacob Pearman, was convicted as charged by a Rutherford County Circuit Court jury of first degree premeditated murder, aggravated assault, and child abuse, and he received an effective sentence of life imprisonment plus five years. See T.C.A. §§ 39-13-202(a)(1), -102(a)(1), -15-401(a).  On appeal, Pearman argues:  (1) the trial court erred in denying his motion for a change of venue; (2) the trial court abused its discretion in declining to strike a juror for cause; (3) the evidence is insufficient to show that he premeditated the victim's killing; (4) the trial court erred in admitting the victim's statements pursuant to the state of mind hearsay objection; (5) the State committed prosecutorial misconduct during its rebuttal closing argument; and (6) the trial court failed to properly exercise its role as the thirteenth juror.[1]  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Luke A. Evans and Heather G. Parker, Murfreesboro, Tennessee, for the Defendant-Appellant, Jacob Pearman.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Jennings H. Jones, District Attorney General; J. Paul Newman and Dana Minor, Assistant District Attorneys General; William C. Whitesell, Jr., Special Prosecutor, for the Appellee, State of Tennessee.

### OPINION

---

[1] We have reordered the issues for clarity.

**Trial.**  Carla Dillard, the victim, began dating Jacob Pearman, the Defendant-Appellant, in 2011.  The victim had a son, M.T.,[2] who was born in 2004 and lived with her.  On November 18, 2012, Pearman and the victim married, and on February 14, 2013, less than three months later, the victim was found dead from manual strangulation and multiple blunt-force injuries.  Pearman confessed to the killing the same day.

Prior to the victim's murder, Pearman was charged with physically abusing his stepson, M.T.  On December 13, 2012, Sharon Leavell, the site director for the YMCA afterschool program at Blackman Elementary School, found M.T. hiding in a corner when it was time for him to go home with Pearman.  M.T. looked "scared[,]" was "visibly shaky, nervous[,]" and begged for Leavell not to send him home with Pearman.

Following a telephone call from Leavell, officers from the Murfreesboro Police Department went to the victim's and Pearman's home on December 13, 2012 for a welfare check on M.T. based on suspected child abuse.  The victim, M.T.'s mother, was the only person at home, and she looked shocked when the officers told her why they were there.  She told the officers that M.T. was at the Murfreesboro Athletic Club (MAC) with Pearman, who worked as a personal trainer.  The officers followed the victim to the MAC, and the victim brought M.T. outside.  Sergeant Patrick Murphy, after obtaining permission from the victim, interviewed M.T. privately and checked to see if he had any injuries.  M.T. had a scrape on his right knee that he said he had gotten on the playground, and Sergeant Murphy did not observe any injuries indicating abuse.  Pearman was not interviewed by officers that day.

On December 14, 2012, around 6:30 a.m., Dana Unklesbay, a special education teacher, was at a traffic light near Blackman Elementary when she saw a small boy, later determined to be M.T., barefoot and wearing pajamas, running down the sidewalk.  At the time, the temperature outside was approximately twenty degrees.  Unklesbay pulled up next to the boy and asked him where he was going, and the boy said he was running away.  Unklesbay told him that she worked at his school and that he needed to get in her car, and she drove him to the school.  On the way, the boy was "very nervous" and kept "frantically looking back."  When Unklesbay asked the boy why he was looking behind him, the boy said "he was afraid that Jake was going to come get him."  He also told her that Jake had kicked him and punished him.  Unklesbay brought the boy into the school and informed the principal, who promptly called the police.

At 6:45 a.m. on December 14, 2012, Officers Patrick Doughtie and Chris Wilkerson went to the home shared by the victim and Pearman to conduct a welfare check on M.T.  The officers knew that the night before, another officer had responded to

---

[2] It is the policy of this court to refer to minor victims by their initials only.

a call to the victim's and Pearman's home regarding a domestic dispute. The victim, who was upset, allowed Officers Doughtie and Wilkerson to enter her home and told them that her son was missing. The officers knew that M.T. was at the school, and they told the victim of his whereabouts. A few minutes after the officers entered the home, Pearman came into the room. Pearman, who was more muscular at that time than he was at the time of trial, did not make eye contact with the officers and appeared "nonchalant." Pearman never asked about M.T., denied the allegations of child abuse, and claimed that the domestic dispute the night before had been about homeschooling M.T. Pearman and the victim agreed to follow the officers to the school in their own car.

Officer Christopher Williams was dispatched to Blackman Elementary School in regards to a "runaway juvenile." When he arrived, M.T. showed Officer Williams and the other officers his injuries, which included red marks on his rib cage that looked like a "footprint," marks that looked like a "handprint" on his neck, a four to five inch scrape on his stomach, a mark on the side of his eye, and a knot on the back of his head. M.T. was "adamant about not returning home." M.T. later saw his mother, the victim, at the school. The victim looked "shocked" after she learned that M.T. said his injuries were caused by Pearman. When the victim asked M.T. if he was lying about Pearman hurting him, M.T. asserted that "[h]e was not lying."

A short time later, Kevin Smith, a Child Protective Services (CPS) Investigator with the Department of Children's Services, and Detective Ava Radley, with the Murfreesboro Police Department, arrived at the school. Detective Radley was present when Smith interviewed M.T. about his injuries. Smith talked with the victim and M.T.'s biological father while at the school. He determined that the safest place for M.T. to live would be with his biological father, to which the victim agreed, and that the victim would have supervised visitation. He also determined that Pearman would have no contact with M.T., which was incorporated into a juvenile court order.

Later that day on December 14, 2012, Pearman and the victim agreed to go the police department for a formal interview. Pearman, after being advised of his rights, gave a video-recorded statement, wherein he told Detective Radley that he and the victim were not feeling well that morning, so he went to get some Advil. When he opened the door to get the dog some water, he noticed that the garage door was open. He and the victim then realized that M.T. was missing from the home. Pearman told Detective Radley that he was the disciplinarian at home and that he spanked M.T. when he misbehaved.

Detective Radley said that she allowed the victim to talk to Pearman alone in the interview room and that this conversation was also recorded. While in the room, Pearman told the victim he did not do anything to M.T. that morning. He claimed he had

not seen M.T. since the night before and did not know how M.T.'s injuries could have occurred, although he noted that M.T. had been to wrestling practice on Monday, a few days earlier.

At approximately 10:00 a.m. on December 14, 2012, M.T. was examined by Dr. Eric Bruno and a nurse at the Middle Tennessee Medical Center. M.T. told the nurse that he had gotten into a fight with his stepfather the previous night. He said that he had lied the previous day and that his stepfather had smacked him in the face. M.T. added that when he awoke that morning, his stepfather choked him, threw him down, kicked him in the side, and made him stare at a wall in the dark before choking him again. After these things happened, M.T. said he ran away from home. During the examination, Dr. Bruno observed an abrasion on the left corner of M.T.'s eye, bruising to the front part of his neck, bruising on the left chest wall, and a scratch and some bruising across his abdomen, which were consistent with M.T.'s description of his stepfather's conduct. Dr. Bruno acknowledged that M.T.'s injuries also could have been consistent with injuries from wrestling practice.

M.T. testified when Pearman picked him up at school on December 13, 2012, he was "scared" because he thought he was going to get in trouble. The next morning, Pearman pulled him out of bed, kicked him in the ribs, and choked him. M.T. began "squealing" because he "couldn't breathe," and Pearman told him to stop. M.T. said that he thought he was going to die while he was being choked. Pearman eventually stopped choking him and made him sit in the corner of the hallway in the dark. Shortly thereafter, Pearman began choking M.T. again, which made it difficult for M.T. to breathe. When Pearman went to his bedroom to get dressed, M.T. ran out of the home through the garage door, and a teacher picked him up near his school a few minutes later. M.T. said he ran away because he did not want Pearman to hurt him anymore. He acknowledged that around the time of this incident, he was on the wrestling team and sometimes got thrown to the ground during practice. However, M.T. asserted that his injuries were from Pearman and not from wrestling practice.

Marilyn Meadow, who worked at the front desk of the MAC, stated that she regularly trained with Pearman. After Meadow heard about the child abuse allegations involving M.T., she confronted Pearman during one of their training sessions and asked if he was getting help. When she asked Pearman about how M.T. had received the marks on his neck and stomach, Pearman said M.T. had gotten them at wrestling practice.

On January 15, 2013, at approximately 5:00 p.m., Officer Shawn Leiser and two other officers responded to a domestic disturbance call at the victim's and Pearman's residence. Pearman claimed that he and the victim were arguing because the victim suspected him of cheating on her, but the victim said that she was considering divorcing

Pearman because of an incident that was keeping her away from her son. Both Pearman and the victim told Officer Leiser that they had not assaulted or threatened each other. Neither party mentioned that Pearman was depressed or suicidal, and Officer Leiser said Pearman did not appear suicidal during the time he was inside their home. After talking with the victim and Pearman, Officer Leiser concluded that "there was stress on the relationship."

On February 1, 2013, the victim met with Mitch Ferguson, an attorney appointed to represent her in the dependency and neglect case regarding M.T. Ferguson informed her of the Domestic Violence Program because he believed she needed counseling and a safe place to stay. He also told her of the various ways to regain custody of M.T., which included divorcing Pearman to ensure M.T.'s safety. Ferguson explained that the farther she and M.T. could be from Pearman, the better off she would be. At this meeting, the victim said Pearman made her afraid for herself and M.T. but that she intended to protect M.T. first and then protect herself. She told Ferguson that "if that required testimony against her husband, then so be it."

Kevin Smith, the CPS investigator, wrote a "Family Services Plan" specifying the steps the victim needed to take in order to regain custody of M.T. The victim was later ordered to attend parenting classes. A "Family Planning Meeting" for the victim was scheduled for February 14, 2013, the same date that a hearing on the child abuse charges against Pearman was to take place. On February 11, 2013, Smith called the victim to remind her about the February 14, 2013 meeting and her parenting classes. During this conversation, the victim said that Pearman wanted her to testify on his behalf at his court date but that "she had no desire of doing so." The victim also mentioned her intention to divorce Pearman so she could get her son back.

On February 11, 2013, the victim told her friend, Ashley Fernandez, that she needed to get her husband out of the house and that she would be needing a roommate so she could stay in her home. The victim informed Fernandez that she had been scared of Pearman, that she was hoping marriage counseling would help, and that Pearman had exhibited anger problems in the past.

As the court date on the child abuse charges approached, the victim told her mother and several friends that she was not going to testify on Pearman's behalf. She also told her mother, her brothers, and several friends that she was going to file for divorce and require Pearman to move out of the house so that she could regain custody of her son. She also told a friend that she was scared of Pearman.

On February 13, 2013, at approximately 9:00 a.m., the victim met with John Green, a divorce attorney. The victim appeared "[r]eserved, quiet, clearly very distressed and troubled," and they discussed potential grounds for divorce, including inappropriate marital conduct, which was formerly known as cruel and inhumane treatment, and irreconcilable differences. The victim later completed a divorce form for Green wherein she marked inappropriate marital conduct and adultery as potential grounds for divorce. She also told Green that she wanted a restraining order against Pearman. The victim told Green that she was not returning to the marital residence because she was afraid, and she promised him that she would go to her brother's home.

Also on February 13, 2013, the victim informed her mother, her son's stepmother, and her friends, Joe Marlow and Megan Porter, that she had packed up Pearman's clothes and was going to require him to leave the home that night. The victim's brother, Chris Parnell, encouraged the victim to have someone with her to keep her safe. Parnell also offered for the victim and M.T. to live with him. The victim told her friends, Joe Marlow and Steve Matranga, that she had found Pearman's gun and intended to hide it.

Terri Cook, one of Pearman's clients at the MAC, said that she saw Pearman at a training session on February 13, 2013, around 7:00 p.m. and that Pearman seemed normal. Patrick Wilson, one of Pearman's co-workers at the MAC, said that he worked out with Pearman before Pearman's boot camp class on the evening of February 13, 2013, and that Pearman's behavior "seemed to be normal."

On February 14, 2013, at approximately 3:00 a.m., Officer Danny Howse, one of Pearman's friends, received a telephone call from Pearman's mother. She said that Pearman had called her and that she needed help. Officer Howse told Pearman's mother to call 9-1-1, and then he contacted his supervisor.

At 3:21 a.m. on February 14, 2013, officers responded to the victim's and Pearman's home based on a report that a male subject inside was possibly suicidal. When the officers failed to get a response after knocking, ringing the door bell, and making several phone calls, they entered the home through an unlocked door in the garage. They found the deceased victim on the bed in the master bedroom. Her body was cold to the touch and rigid, and her face was bloody from injuries to her upper lip and nose. No one else was inside the home. The officers observed several trash bags full of clothes by the front door.

Later that morning, Sergeant Christopher Ashley acquired Pearman's cell phone number and left him a voicemail message. Pearman returned his call a few hours later and told Sergeant Ashley of his whereabouts. Shortly thereafter, an officer with the Manchester Police Department located Pearman at a Kangaroo Express Market and took

him into custody. At the time, Pearman looked "normal" and showed "no emotion." Detectives Ed Gorham and Paul Mongold drove to Manchester Police Department to pick up Pearman. On the ride back, Pearman appeared relaxed and calm. Pearman told Detective Gorham that he looked familiar, and Detective Gorham replied that it must be from the gym, and he and Pearman "had a little laugh" about that. Detective Gorham and Pearman also discussed weightlifting and Alabama football. Detective Mongold said that the only emotion he noticed from Pearman was when Pearman gave "a slight chuckle to a joke."

At 8:45 a.m. on February 14, 2013, Detective Gorham and Detective James Abbott informed Pearman of his rights and conducted a formal interview. Pearman subsequently provided the following written statement:

> We started off fighting at 4:00 am Wednesday morning cause [sic] I was in a bad mood [and] didn't feel like talking or training [the victim] at 7:00 a.m. Wednesday morning. I was upset over the court date that was set the next day, 2-14-13. We argued over text message throughout the day while we were both at work. When I came home around 8 pm-8:30 pm that evening I noticed the garage door was wide open & when I walked in the door I had clothes piled up by the door. I asked her what was going on & she told me that she thought it would help if I left but she wasn't sure. She then proceeded to tell me that she has talked to an attorney & the guy at DCS and they told her she would never get her son back as long as I lived in the house and the faster she got me out the better it would look on her and she didn't need to appear in court with me on Thursday 2/14/13 at 8:00 am because it would make her look like a horrible mother that she chose her husband over her son. We continued to talk/argue over that from that time on till [sic] around 1:00 am. During that time, we called my mother and spoke with her over speaker phone about the situation. Also talked/argued while I took a shower to the moment we laid [sic] in bed and continued to talk/argue about what to do. At that time of everything that happened I was suicidal never homicidal & I was set off by something she said and I hit her 2 or 3 times in the face then choked her. We made it down to the floor at the end of [the] struggle, I laid her in bed covered her and laid [sic] with her for a brief period. Then proceed[ed] to hold the dog for a bit and I went to the garage to get my gun to commit suicide and I noticed she had taken it. I searched the house for it & when I couldn't find it I called my parents & told them what I had done & I left the house & headed south until I called Chris Ashley & turned myself in.

A video recording of Pearman's interview with Detectives Gorham and Abbott was played for the jury. During this interview, Pearman said that the victim told him he

- 7 -

needed to be out of the house in order for her to get her son back. Pearman got upset because he had to be in court the next day, and the victim was supposed to appear with him. He reminded her that months ago he had told her that if she wanted him out of the house, she needed to let him know and not wait until the last minute. They continued to argue throughout the night, and Pearman went through the victim's phone and discovered that M.T. had been staying with the victim's parents. He believed that the victim's parents had been "coercing" M.T. to say things about him that were not true. Pearman and the victim argued back and forth over this issue until Pearman "just lost it."

Pearman said he hit the victim in the face because he knew the victim was lying to him and did not care about him. He said, "[The victim's] like I don't need to be worried about you, I need to be worried about getting my son back and that's when I was hurt and I'm like, you know I didn't do anything to your son and I'm the one that's facing whatever consequence that could come from that because of something I didn't do. . . . " Pearman said he did not remember exactly what the victim said that caused him to lose control.

After Pearman hit the victim once or twice with a closed fist, the victim begged him to stop and told him she would do whatever he wanted her to do, and Pearman began choking her with both hands. Pearman said that he choked her for "a long time" until she lost consciousness and that he did not check on her because he knew she was dead. Detective Abbott asked, "So you knew that you had choked her until she died?," and Pearman responded, "Yes, sir." Once the victim stopped moving, Pearman checked her pulse and listened for her heartbeat.

Afterward, Pearman wanted to kill himself but was unable to find his gun. He tried to kill himself with a trash bag but could not go through with it. He then called his father and told him what he had done.

Officers took photographs of the scratches on Pearman's face, neck, arm, and torso. Pearman said he received these scratches when he was choking the victim and she tried to fight back. When Detective Abbott asked, "[D]id you maybe increase it or intensify the assault, the choking, as she was trying to fight back?," Pearman replied, "Yes sir." At the conclusion of this interview, Pearman was arrested.

Testing conducted by the Tennessee Bureau of Investigation established that fingernail clippings taken from the victim contained Pearman's DNA and that blood on Pearman's shorts belonged to the victim.

Dr. Feng Li, the medical examiner who performed the victim's autopsy, opined that the victim's cause of death was a combination of multiple blunt force injuries and

strangulation and that either the blunt force trauma to the victim's brain or the strangulation was sufficient to cause her death. He said that the victim's blunt force injuries caused bleeding under the skin of the head and bleeding inside her brain. He also noted that the victim had abrasions on her head and face and contusions on her chest and upper arm. He added that the combination of abrasions on the victim's neck, the petechial hemorrhages on the victim's eyelids and conjunctiva, and the hemorrhages in the victim's neck muscles indicated manual strangulation. Dr. Li explained that during manual strangulation, a person would most likely become unconscious within ten to thirty seconds, and that if the application of pressure continued, the person would die within a few minutes. He noted that the victim's blunt force injuries to her face were consistent with someone striking her multiple times with a closed fist and that the victim's injuries indicated that a struggle took place. Dr. Li stated that if a strangler stopped the pressure once a person lost consciousness, then that person could recover.

Mike Jones, one of Pearman's friends, testified that he met Pearman at the MAC. He knew the victim and M.T. and occasionally socialized with them. After hearing about the child abuse charge, Jones visited Pearman and the victim, who both appeared "upset" and "[d]epressed." Jones next saw Pearman and the victim in January 2013 when he went to their house to watch a football game. During that visit, the victim and Pearman "seemed pretty jovial" and celebrated their team's win.

Amy Stevens, the Defendant-Appellant's sister, testified that she saw her brother and the victim at her parent's home when they celebrated Christmas together in 2012. She said Pearman and the victim were "affectionate" with one another and were "[h]olding hands, laughing, cutting up." During that visit, the victim told Stevens that "[s]he was eager and excited to have a baby" with Pearman. At the time, Stevens did not know that Pearman had been charged with child abuse. She said Pearman did not appear suicidal or depressed during Christmas.

Stevens next saw Pearman when she and her father visited his home on January 13, 2013, to help him move his belongings back to their parents' home. At that time, Stevens and the family were aware that Pearman had been charged with child abuse. Stevens said Pearman wanted the police present when he moved his things out "because he didn't want to be accused of doing something that he hadn't done." When Stevens and her father arrived at their house, Pearman and the victim came to the door "arm-in-arm." They said everything was okay and then talked privately in their bedroom for forty-five minutes. Ultimately, Stevens and her father left without moving Pearman's belongings. When Stevens saw Pearman and the victim again for the Super Bowl game on February 3, 2013, they were "very affectionate" with one another. Stevens said that Pearman did not appear suicidal or depressed on that date.

Donna Pearman, the Defendant-Appellant's mother, stated that her son and the victim were very loving and affectionate with one another prior to their wedding in November 2012. She said that her son told her about the child abuse charges around December 15, 2012, and that initially, her son could not explain how M.T. had gotten the injuries. However, "later on," both her son and the victim talked about M.T. receiving these injuries from "wrestling" or "the dog." Following these charges, Mrs. Pearman[3] said her son seemed "[s]ad" and the victim was "bothered." When they celebrated Christmas 2012 together, her son and the victim were "loving, affectionate, teasing each other" and informed her that they wanted to have a baby together. When Mrs. Pearman saw her son and the victim on Super Bowl Sunday, February 3, 2013, she said they were "[v]ery playful and affectionate." When she went to dinner with them a few days later, her son and the victim behaved normally.

Mrs. Pearman said that on February 13, 2013, at approximately 10:00 p.m., her son and the victim called her. During this call, her son was "[d]evastated" and "started crying," but the victim was "calm." The victim told Mrs. Pearman that someone had told her she had to choose between M.T. and her husband. Her son said his clothes and shoes were by the front door, and she assumed he had packed his belongings and was planning to leave. During their telephone conversation, the victim never indicated that she wanted Pearman to leave the home and never said that she would not attend Pearman's hearing on the child abuse charges the following day. While they were talking, her son shared that the victim had found inappropriate pictures on his cell phone and that he had told the victim about being raped by a neighborhood child when he was five years old, which caused him to have trouble with sex. Mrs. Pearman acknowledged that the first time her son talked to her about this rape was after the victim found inappropriate photographs on his phone. She said her son and the victim "seemed okay" when she hung up the phone. Around midnight, Mrs. Pearman sent a text message to her son and the victim, asking if they were all right, and the victim texted her back, stating, "Yeah, going to bed." She said her son called her home early the next morning, and based on her husband's responses during that conversation, Mrs. Pearman called Officer Howse and then called 9-1-1.

## ANALYSIS

**I. Denial of Motion for Change of Venue.** Pearman contends that the trial court erred in denying his motion for a change of venue. He asserts that the denial of his request for a change of venue, or alternatively an out of county jury, violated his right to a fair trial in light of the extensive and inflammatory publicity surrounding his case.

---

[3] Because the Defendant-Appellant and his mother share the same last name, we will refer to the mother as "Mrs. Pearman." We intend no disrespect to the other individuals referenced in this opinion.

Because Pearman has failed to establish that the jurors who heard his case were biased or prejudiced, he is not entitled to relief.

Pearman applies many of the factors outlined in State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979), to support his argument that a change of venue, or at the very least an out of county jury, was necessary to protect his right to a fair trial. He asserts that the publicity surrounding his case began on the date of his arrest, continued through trial and sentencing, and concluded only at the end of all the post-trial motions. He claims that this publicity was inflammatory and pervasive, "with articles covering each and every court date and television cameras in trial each day of the trial," and that it provided detailed coverage of some evidence that was not admitted at trial. Additionally, he maintains that this publicity, some of which evidenced a clear hostility toward him, saturated the area from which the venire was drawn and resulted in the court nearly depleting all potential jurors before jury selection was completed. Pearman emphasizes that he exhausted all of his peremptory challenges and that he unsuccessfully challenged several potential jurors for cause before he was convicted of the charged offenses.

Tennessee Rule of Criminal Procedure 21(a) provides that a trial court may change venue upon a defendant's motion "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." A motion for a change of venue "shall be accompanied by affidavit(s) averring facts constituting the alleged undue excitement or other cause on which the motion is based" and "shall be made at the earliest date after which the cause for the change of venue is alleged to have arisen." Tenn. R. Crim. P. 21(b), (c).

The decision to grant or deny a motion for a change of venue based on pretrial publicity rests within the sound discretion of the trial court, and this court will not reverse on appeal, unless the trial court abused its discretion. State v. Davidson, 121 S.W.3d 600, 611-12 (Tenn. 2003); State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001) (citing State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993)). Extensive knowledge in the community of the crimes or of the alleged criminal is not sufficient, in and of itself, to render the trial unconstitutionally unfair. Crenshaw, 64 S.W.3d at 387. This court may not presume unfairness based solely on the amount of publicity unless the "'trial atmosphere [is] 'utterly corrupted by press coverage.'" Id. (quoting Dobbert v. Florida, 432 U.S. 282, 303 (1977). "Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice." Id.; see State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997). The proper test is "whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989); see Davidson, 121 S.W.3d at 612.

Factors that a trial court should consider in determining whether to grant a change of venue include:

the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire persons' familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations, or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury.

State v. Sexton, 368 S.W.3d 371, 387 (Tenn. 2012) (citing State v. Rogers, 188 S.W.3d 593, 621-22 (appendix) (citing Hoover, 594 S.W.2d at 746)).

Although the murder offense in this case was committed on February 14, 2013, Pearman's trial did not occur until nearly two years later in January 2015. Pearman first filed a motion for change of venue on February 11, 2014, alleging that "based on the nature of the allegations against him, the amount of pretrial publicity that has occurred relating to these charges in this county, as well as the specific and inflammatory nature of that publicity, it is impossible for him to receive a fair trial if it is decided by a jury in this venue." An affidavit was attached to this motion, wherein a licensed private investigator swore that she had investigated the media coverage of Pearman's case and found forty articles or stories related to Pearman's case, which were made exhibits. Although the affidavit referenced forty exhibits, and identified and summarized the content of most of these exhibits, only fourteen of the forty exhibits[4] were included in the supplemental record requested by Pearman. These fourteen exhibits consisting of internet news

---

[4] Although all forty of these exhibits were included in an appendix to Pearman's appellate brief, we are precluded from considering any information that was not included in the record on appeal. See State v. Matthews, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990) (holding that this court could not consider a transcript attached to the appellant's brief because it was not made a part of the record). The affidavit indicates that these missing exhibits included internet news articles, video recordings of news stories, and internet stories, all of a similar character to the ones included in the record. For this reason, Pearman has waived any issues regarding the missing exhibits. See Tenn. R. App. P. 24(b).

articles, a still shot of a YouTube recording showing Pearman in a workout video, and internet stories and posts, which included negative comments about Pearman and photographs of Pearman, the victim, and the victim's son with his face obscured.

At the hearing on this motion, the trial court heard arguments from the parties, reviewed the applicable factors, and considered the documents submitted by Pearman. It found that despite Pearman's arguments to the contrary, the publicity about the case had not permeated the area and that "the majority of the publicity in this case was created immediately at the time of the event and between that time and the time of the preliminary hearing." The court added:

> Since then, there ha[ve] been some anecdotal stories. Yes, there's something up on YouTube, and there's something called The Dirty and the Murfreesboro Pulse and other things that seem to continue maybe to bring it up. But the Court does not find that that rises to the level to require a change of venue.

For all these reasons, the trial court denied the motion.

On December 30, 2014, just weeks prior to trial, Pearman filed a renewed motion for change of venue and sequestration. In it, Pearman asserted that there had been additional publicity about his case in the regional and local media and attached twelve exhibits consisting of articles and television broadcasts about pretrial motions, some of which concerned the admissibility of evidence at trial.

The trial court, in its written order denying the motion, stated that it considered the Rogers/Hoover factors and determined that "the vast majority of the publicity related to this trial was related to the arrest and subsequent proceeding[s] [regarding] the initial investigation of the case almost two years before the filing of this motion." The court considered the additional news coverage referenced by Pearman and found that there was "no proof of any inflammatory or unfair publicity that has permeated the community or the area from which the venire is drawn." Although this order did not mention whether Pearman's request for a sequestered jury was granted, the trial transcript shows that the jurors who rendered a verdict in Pearman's case were sequestered.

In his brief to this court, Pearman concedes, and we agree, that the "the parties and the Court exercised the utmost degree of care in selecting the jury, including conducting individual voir dire on several different topics." The transcript from voir dire proceeding shows that the trial court allowed individual voir dire of all potential jurors who said they had been exposed to publicity about the case, had knowledge of the case, or were personally affected by domestic violence or child abuse . Out of the first thirty-four

- 13 -

potential jurors that were called, eleven stated that they had heard something about the case. After holding individual voir dire for these eleven potential jurors, the court excused four of them for cause based on their inability to render an impartial decision. Only four of the remaining seven jurors who said they had heard something about this case sat on Pearman's jury, and all four of these individuals stated that they were able to recall very little information about the details of the case and could render a verdict based on the evidence presented at trial. The record shows that Pearman did, in fact, exhaust all of his peremptory challenges during jury selection. Although he made a total of four challenges for cause that were unsuccessful, only one of these four individuals, Juror Thompson, sat on Pearman's case.

As to Juror Thompson, Pearman claims that the trial court erred in refusing to strike this juror for cause based on his exposure to publicity regarding the trial and his personal knowledge of the case. As we will explain in the next section, the trial court did not err in declining to strike Juror Thompson for cause. The record from voir dire established that Thompson had not formed an opinion about Pearman's case, could set aside any knowledge he had in determining the case, and could render a verdict based on the evidence presented at trial.

We conclude that Pearman has failed to show that the publicity regarding his case utterly corrupted the trial atmosphere. The trial court specifically noted although there was some publicity about this case at the time of the offense, the publicity had decreased by the time of trial. See State v. Grooms, 653 S.W.2d 271, 273-74 (Tenn. Crim. App. 1983) (concluding that the trial court did not abuse its discretion in denying the change of venue when publicity concerning the case had substantially decreased by the time of trial and the jurors who heard the case were unprejudiced by this publicity).

Although Pearman referenced numerous news and online articles regarding his case, he never established what portion of the jury pool was exposed to these articles. The transcript from the voir dire proceeding shows that the jurors who heard about his case were extensively questioned by counsel and the trial court about their knowledge of the case and their ability to impartially consider the proof . See Davidson, 121 S.W.3d at 611 (concluding that the trial court did not abuse its discretion in denying a change in venue when it conducted an extensive evidentiary hearing and detailed voir dire proceeding and there was "no evidence that any juror was actually biased or prejudiced against [the defendant]"). The trial court in Pearman's case "carefully and meticulously orchestrated the jury selection process to insure that the appellant received a fair trial." Hoover, 594 S.W.2d at 746; see Davidson, 121 S.W.3d at 612 (noting that that "the trial court conducted a meticulous and detailed jury selection process"). Pearman has not shown that any of the jurors were unable to decide his case based on the evidence presented at trial and the applicable law. See State v. Evans, 838 S.W.2d 185, 192 (Tenn.

- 14 -

1992) (concluding that the defendant did not show prejudice when the jurors who had been exposed to pretrial publicity stated that they would render a verdict based on the evidence presented at trial). Because Pearman has failed to establish that any of the jurors who rendered a verdict in his case were prejudiced by the publicity surrounding his case, we conclude that the trial court did not abuse its discretion in denying the motion for a change in venue.

**II. <u>Denial of Challenge to Strike Juror For Cause.</u>** Pearman contends that the trial court erred in denying his challenge to strike Juror Thomson for cause, which violated his right to an impartial jury. He claims Thompson, a member of the gym where Pearman worked, had a "close situational relationship to the case" because he engaged in gossip with other individuals at the gym about his case. Although Pearman acknowledges that Thompson said he could put aside what he knew about the case, he claims Thompson's "knowledge of extrajudicial, prejudicial information" prevented him from performing his duties as an impartial juror. He also claims that he was not "wholly satisfied that [Juror Thompson's] own words [during voir dire] completely absolved him from any taint he previously disclosed" and that Thompson's "connection with people and places involved in the case was so close that regardless of his answer, the trial court should have presumed prejudice on the part of this juror and should have dismissed the juror for cause." We conclude that the record shows that the trial court did not abuse its discretion in declining to strike Juror Thompson for cause.

The record shows that during voir dire Thompson disclosed that he was a member of the Murfreesboro Athletic Club where Pearman worked. Thompson added that he had "kept abreast" of the case by reading some articles in the newspaper and that Pearman's case had been a topic of conversation at the gym. Although Thompson did not know Pearman or the victim, he recognized Pearman from the gym and had seen photographs of the victim. Despite this, Thompson said that he could put aside what he knew about this case, listen to the evidence presented, and be fair to both sides in making a decision.

At the defense's request, individual voir dire of Thompson was conducted. In response to questioning from the defense, Thompson said that he had read the initial newspaper articles after the murder occurred and that approximately one month before trial, he had "Googled and started reading about some of the evidence that maybe the [S]tate was wanting . . . to present[,]" including the testimony of the victim's child. He also remembered something about some Facebook and email messages that the State might present as evidence but he could not recall the nature of the other evidence referenced in the articles. Thompson stated that these articles did not give him a preconceived notion or opinion about the case. He also said that during a conversation at the gym, he heard rumors that Pearman was having affairs with other members of the gym, although Thompson did not know the individuals allegedly involved. Despite

knowing these things, Thompson stated that he could put this information aside and be a fair and impartial juror in this case. He also said that he could follow the instructions of the court and focus on the evidence presented at trial. After hearing these responses, defense counsel made a motion to strike Thompson for cause,[5] arguing that "in response to jury service [Thompson] Googled the case, kind of researched up on it, said he read articles about what evidence was being argued, pretrial motions as far as admissibility." He also asserted that Thompson was a "part of the gossip world at the MAC regarding affairs and finger pointing" and that although Thompson said he could be impartial, the trial court should question that claim. Defense counsel argued that "to allow [Thompson] on this jury would deprive Mr. Pearman [of] a fair trial."

The trial court denied the defense's request to strike Thompson for cause, stating:

[Thompson] answered the questions candidly. He was honest about what he had seen. The Court feels he was honest about [whether] he could set those things aside.

Specifically, he was asked about evidence. He couldn't remember what that evidence contained. He made references to Facebook and [email] messages, but didn't recall any specifics about what was contained in those messages.

And as to the discussion about the gym, [he] said that he could take that out of his mind and make his decision solely based on what evidence came out of the witness stand.

Later, during group voir dire, when defense counsel asked Thompson and some other potential jurors if he could render a verdict of not guilty if the State failed to meet its burden of proof, Thompson replied, "I believe so." When defense counsel asked if the potential jurors would hold the State to its burden and require the State to prove each and every element of the charged offenses, Thompson responded, "Yes."

Both the state and federal constitutional guarantee an accused the right to trial by an impartial jury. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "A court may discharge from service a . . . petit juror . . . who is disqualified from such service, or for any other reasonable or proper cause, to be judged by the court," including "[t]hat a state of mind exists on the juror's part that will prevent the juror from acting impartially."

---

[5] The record shows Pearman made a for cause challenge to Juror Thompson because he had already utilized all of his peremptory challenges.

T.C.A. § 22-1-105. Regarding challenges for cause to prospective jurors, Tennessee Rule of Criminal Procedural 24(c)(2) provides:

> Any party may challenge a prospective juror for cause if:
>
> (A) Cause Provided by Law. There exists any ground for challenge for cause provided by law;
>
> (B) Exposure to Information. The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Typically, juror disqualifications fall into one of two categories, propter defectum and propter affectum. Propter defectum, which means "'on account of some defect,'" refers to "'personal objections, as alienage, infancy, lack of statutory requirements[.]'" Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945) (quoting 1 Bouv. Law Dict., Rawle's Third Revision, page 451). Propter affectum, which means "'on account of partiality,'" refers to "'some bias or partiality either actually shown to exist or presumed to exist from circumstances.'" Id. (quoting 1 Bouv. Law Dict., Rawle's Third Revision, page 451). Propter affectum challenges may be made after the return of the jury verdict. Carruthers v. State, 145 S.W.2d 85, 94 (Tenn. Crim. App. 2003). Here, Pearman complains that Juror Thompson had some bias or prejudice against him, so his claim is one of propter affectum. See id. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993) (citing Bowman v. State, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980)).

It is well established that "[p]rospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury." Crenshaw, 64 S.W.3d at 386 (citing State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991)). There is no requirement

that jurors be completely ignorant of the facts involved in a case; they may sit on the case even if they have formed an opinion on the merits so long as they are able to set aside that opinion and render a verdict based on the proof presented at trial. Howell, 868 S.W.2d at 249; State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992). The determination regarding a juror's impartiality is within the discretion of the trial court. Brown, 836 S.W.2d at 549; State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). We note that "[t]he trial court, rather than the appellate court, is clearly in the better position to observe the demeanor, attitude, and body language of a potential juror from which the court may conclude the potential juror's capability of impartiality." State v. Lorenzo Malone, No. M2003-02770-CCA-R3-CD, 2005 WL 1521788, at *3 (Tenn. Crim. App. June 27, 2005).

Citing State v. Pamplin, 138 S.W.3d 283 (Tenn. 2003), Pearman argues that the trial court should have dismissed Thompson for cause because Thompson's connection to the gym where he was employed was "a close situational relationship" that resulted in a presumption of prejudice. In Pamplin, the challenged juror, a deputy sheriff, knew both the defendant and the victim police officer and was subordinate employee of a prosecuting witness. Id. at 285. In determining whether the trial court erred in refusing to strike this juror, the court outlined two situations in which a trial court should sustain a challenge for cause:

> The first is where the prospective juror indicates by his or her answer that they cannot or will not be a fair or impartial juror. The second is where, irrespective of the answers given on voir dire, the trial court should presume the likelihood of prejudice on the part of the prospective juror because the potential juror has such a close relationship, be it familial, financial, or situational, with any of the parties, counsel, victims, or witnesses.

Id. at 286. The court observed that the juror's "professional relationship and interest in the case was entirely too close" to that of the victim and the prosecuting witness. Id. It also recognized that "the nature of the case involved an assault upon a law enforcement officer" and that the challenged juror served as the jury's foreman "while in full uniform and with a sidearm." Id. Consequently, the court reversed the defendant's convictions and remanded the case for a new trial. Id. at 287.

Pearman's case is clearly distinguishable from Pamplin. Although Juror Thompson was a member at Pearman's gym and heard gossip about the case, he did not know Pearman or the victim personally. The record shows that Juror Thompson unequivocally said that he could set aside any knowledge he had about the case and focus on the evidence at trial, that he could be a fair and impartial juror, and that he could

- 18 -

follow the instructions given by the court. There is no proof that Juror Thompson was not fair and impartial. Because Pearman has not shown that the trial court abused its discretion in declining to excuse Juror Thompson for cause, he is not entitled to relief on this issue.

**III.** **Sufficiency of the Evidence.** Pearman also argues that the evidence is insufficient to sustain his conviction for first degree premeditated murder because the proof failed to show that he premeditated the killing. We conclude the evidence is sufficient to sustain the jury's verdict.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing Evans, 838 S.W.2d at 191). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

First degree murder, as applicable here, is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). Premeditation is defined as "an act done

after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Davidson, 121 S.W.3d at 615; Bland, 958 S.W.2d at 660. A jury also may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Methods of killing that require more time, effort, and intimate contact than the pulling of a trigger on a gun are more consistent with premeditation. State v. Adams, 405 S.W.3d 641, 663 (Tenn. 2013).

Pearman claims that none of the factors indicative of premeditation were supported by the proof at trial. He asserts that he never declared an intent to kill the victim, that the homicide was not particularly cruel or heinous, and that while there was a gun in the home, there was no proof that he procured the weapon for the purpose of killing the victim. He notes that he made no preparations to conceal the crime prior to the killing and that he did not destroy evidence of the crime, and he emphasizes that he turned himself into the police and later confessed to the crime. Pearman challenges the State's claim that he was calm after the killing by asserting that he panicked, fled the scene, called his parents, and considered committing suicide after killing the victim. Additionally, he observes that "[r]epeated blows can be delivered in the heat of passion, with no design of reflection" and that this factor alone cannot be relied upon in proving premeditation. Brown, 836 S.W.2d at 542. Finally, Pearman asserts that "[i]f the purpose to kill is formed in passion and executed before the passion cools, it is murder in

the second degree, not murder in the first degree." State v. Brandon Compton, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992, at *5 (Tenn. Crim. App. Oct. 13, 2006) (citing Brown, 836 S.W.2d at 539-40).

Viewing the evidence in the light most favorable to the State, we conclude that a rational jury could have found that Pearman's killing of the victim was premeditated and intentional. Pearman confessed to strangling the victim. During his interview with police, Pearman said that when he came home on February 13, 2013, the victim had packed his belongings. He said the victim told him that she believed he needed to leave her home in order to regain custody of her son and that she would not be going with him to the hearing the next day on his child abuse charges. Pearman admitted that he "just lost it" because of something the victim said and punched her several times in the face. When the victim began begging for him to stop and told him she would do whatever he wanted to do, Pearman manually strangled her. Pearman admitted to police that he increased the pressure of his choking during the struggle and that he choked the victim until she died. After killing the victim, Pearman checked her pulse and breathing to confirm that she was dead, but he never called 9-1-1 and never attempted to render first aid to her.

Aside from Pearman's admissions, the manner of the victim's death strongly supports a finding of premeditation. Dr. Li testified that the victim's cause of death was a combination of multiple blunt force injuries and strangulation and that either the blunt force trauma to the victim's brain or the strangulation could have caused the victim's death. He stated that although the victim would have become unconscious within ten to thirty seconds of being choked, it would take a few minutes of constant pressure to cause her death.

In addition, Pearman's demeanor after the killing supports the jury's finding of premeditation. When Pearman was taken into custody a few hours after the killing, he showed no emotion and appeared calm and relaxed. On the way to the police station, Pearman and Detective Gorham laughed about working out and talked about weightlifting and football. Detective Mongold said that the only emotion that Pearman showed during the ride to the station was "a slight chuckle to a joke." Our review of Pearman's video-recorded statement to police shows that he appeared exceedingly calm during almost all of his interview.

The jury, after hearing all of the proof in this case, rejected Pearman's claim that he did not form the intent to kill the victim prior to the act itself. We will not second-guess the jury's decision in light of the evidence that the killing was premeditated.

**IV.  Admission of Statements of the Victim.**  Pearman contends that the trial court erred in admitting the victim's hearsay statements that she was scared of him, that she intended to leave him, and that she was not going to attend his court date regarding the child abuse charges.  He claims that although the State offered this proof as evidence of the victim's state of mind, these hearsay statements were only relevant to prove his premeditation, and, therefore, were inadmissible.  He also maintains that the admission of this evidence was not harmless because the proof of premeditation was not overwhelming.  We conclude that the trial court did not abuse its discretion in admitting the majority of these statements, and that if the trial court erred in admitting a few these statements, particularly the ones regarding the victim's fear of Pearman, then the admission of these statements was harmless given the proof of premeditation in this case.

The Tennessee Supreme Court has held that the appellate standard of review for rulings on hearsay evidence consists of multiple layers:

> Initially, the trial court must determine whether the statement is hearsay.  If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions.  To answer these questions, the trial court may need to receive evidence and hear testimony.  When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them.  State v. Gilley, 297 S.W.3d at 760-61.  Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review.  State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  "Hearsay is not admissible except as provided by these rules or otherwise by law."  Tenn. R. Evid. 802.  In this case, the victim's out-of-court statements were hearsay.  However, many of these statements were admissible pursuant to Tennessee Rule of Evidence 803(3), which provides an exception to the hearsay rule for statements of a declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)."  The Advisory Commission Comment to Rule 803(3) provides that under the state of

mind exception to the hearsay rule "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception."

The record shows that Pearman filed a motion in limine to preclude the State from mentioning or eliciting any statements at trial that were alleged to have been made by the victim, or alternatively, to require that the State request a hearing out of the presence of the jury before mentioning or eliciting such statements. At the hearing on this motion, the defense argued that the victim's statements were inadmissible hearsay, and the State asserted that most of these statements were admissible as exceptions to the hearsay rule. The trial court held that while it was denying the request to issue a blanket limitation on all of the victim's statements, it would require the State to initiate a jury-out hearing prior to knowingly presenting evidence of the victim's statements, so that the court could determine the admissibility of such statements. The trial court noted that if a witness, in response to a question by either party, mentioned a statement made by the victim, then either side would need to object so that the court could make a ruling regarding the admissibility of the statement.

Pearman specifically challenges the admissibility of the following statements:

1.    Marjorie Dillard, the victim's mother, testified that the victim "wanted to get [Pearman] out of her and [M.T.'s] life" and that the victim had told her "she had talked to any attorney about a divorce."

2.    Attorney John Green testified that during the appointment on February 13, 2013, the victim told him that "she was not going to return home" and that "she was afraid to go home."

3.    Attorney Mitch Ferguson, who was appointed to represent the victim in the dependency and neglect case involving M.T., testified that during the appointment on February 1, 2013, the victim "was seriously afraid for her child and for herself of her husband."

4.    Chris Parnell, the victim's brother, testified that the victim told him that she was "going to divorce [Pearman]" and that she had "contacted an attorney." Parnell also testified that the victim said that she "was going to pack [Pearman's] clothes so he could leave."

5.    Officer Shawn Leiser testified that when he was dispatched to the victim's and Pearman's home in regard to a domestic dispute on January 15, 2013, the victim stated "that she was on the verge of deciding whether or not they were going to do—were going to have

a divorce due to an incident that was keeping her separated from her son."

6.  Ashley Fernandez testified that on February 11, 2013, the victim told her "[s]he was needing a roommate pretty soon" because "[s]he was going to be leaving her husband" and "if she didn't find a roommate, that she was going to have to move out of the house." Fernandez also testified that the victim said "she had been scared of [Pearman]" and that "she was hoping that marriage counseling would help."

7.  Sean Eden, who had previously dated the victim, testified that the victim told him on February 13, 2013 that she "was trying to get some advice on how to get the divorce or how to file the divorce or who to call about the divorce and some issues like that."

8.  Christian Cooper, the victim's friend, testified that the told her on February 12, 2013 that "she was going to make [Pearman] move out and she was going to get a divorce."

9.  When the State asked Joe Marlow, the victim's friend, if the victim intended to follow through with her divorce of Pearman based on the conversation he had with her on February 13, 2013, Marlow replied, "Yes."

10.  Megan Porter testified that the victim "went to a lawyer that day, February 13" for help "getting a divorce." She also said that the victim's "intentions after leaving the lawyer's [office] was to get [Pearman's] belongings packed up and to get him out of the house that night."

11.  Steve Matranga testified that when he talked to the victim on February 13, 2013, she told him "she packed [Pearman's] stuff up."

Although the defense made numerous hearsay objections throughout trial and engaged in extensive argument regarding the admission of a variety of the victim's hearsay statements, our review of the trial transcript showed that Pearman arguably waived any issues regarding the admission of statements 1, 3, 4, 5, 6, 7, 8, 9, 10, and 11 by failing to make a contemporaneous objection to this testimony at trial. See Tenn. R. App. P 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1)

(requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). In any case, we conclude that if the trial court did erroneously admit any of the challenged statements, the admission of these statements was harmless in light of the evidence of Pearman's premeditation.

To be admissible, all evidence must be relevant to an issue the jury must decide. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes).

Pearman, citing State v. Leming, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998), correctly asserts that Rule 803(3) can only be used to prove the declarant's intent or conduct and not that of a third party. He also references State v. John Parker Roe, No. 02C01-9702-CR-00054, 1998 WL 7107, at *12 (Tenn. Crim. App. Jan. 12, 1998), and State v. Lucien Samuel Sherrod, No. 01C01-9505-CR-00157, 1997 WL 34429, at *7 (Tenn. Crim. App. Jan. 30, 1997), which held that a victim's statements expressing fear of the defendant are inadmissible to prove a defendant's premeditation. He claims that unlike John Parker Roe and Lucien Samuel Sherrod, the admission of the challenged statements is not harmless because the proof of premeditation was not overwhelming.

In Leming, 3 S.W.3d at 8, the defendant was convicted of first degree premeditated murder of her husband. At trial, a witness testified that the victim said he wanted to bring his guns over to the witness's house, and when the witness asked him for a reason, the victim told him, "Well I'm afraid of [the defendant] and don't know what she will do." Id. at 17. The trial court ruled that the statement was admissible under the state of mind exception to the hearsay rule in Rule 803(3). Id. It then provided a limiting instruction, stating that while "the jury could not consider the testimony as proof that the defendant actually killed the victim," the jury could "accept [the testimony] if you believe it, as proof of the fact that she may have been planning or deliberating murder prior to actually committing it." Id. (internal quotation marks omitted). The defendant appealed, arguing that the trial court erred in allowing this witness to testify about the victim's statement. Id. This court, recognizing that a declarant's conduct and not a thirty party's conduct was provable by this hearsay exception, held that the trial court erroneously instructed the jury that the victim's statement could be used to show the defendant's

- 25 -

premeditation. Id. at 18. It also reiterated that statements made by a murder victim expressing his or her fear of the defendant were not relevant to prove whether the defendant committed murder. Id. (citing State v. Smith, 868 S.W.2d 561, 573 (Tenn. 1993)). After acknowledging that there was no evidence presented or claim made about the victim's conduct that would make the victim's state of mind relevant to an issue at trial, the court held that the trial court erred in admitting this statement. Id. It also concluded that the court's erroneous admission of the statement was not harmless because the proof "fell far short of overwhelming with respect to proof of the defendant's premeditation." Id. As a result, this court reversed the conviction and remanded the case for a new trial. Id. at 19.

As support for his claim that a victim's statement of fear should not be offered to prove a defendant's premeditation, Pearman cites John Parker Roe and Lucien Samuel Sherrod. In John Parker Roe, 1998 WL 7107, at *1, the defendant was convicted of first degree premeditated murder for killing his wife. At trial, the victim's teacher testified that two days prior to her death, the victim told him that her husband had abused her and threatened to kill her. Id. at *10. The teacher said the victim asked him to call her mother and father if she did not appear for class on Friday and gave him her parents' telephone numbers. Id. The defendant appealed, arguing that the trial court erred in admitting this testimony. Id. The State asserted that the teacher's testimony about what the victim told him was admissible under Rule 803(3) because it rebutted the defendant's claim in his opening statement that his marriage to the victim was "a good marriage and a happy marriage" and that they loved one other. Id. The court concluded that because the State offered this testimony at trial for the sole purpose of proving the defendant's premeditation and deliberation and not to rebut the defendant's claim in his opening statement that he had a good marriage, the admission of the testimony was error. Id. at *12. However, it concluded that because the evidence as to premeditation was overwhelming, any error was harmless. Id.

Similarly, in Lucien Samuel Sherrod, 1997 WL 34429, at *1, the defendant was convicted of first degree premeditated murder. At trial, several witnesses testified about the victim's statements expressing her fear of the defendant. Id. at *6. On appeal, the defendant argued that the trial court erred in admitting these statements and that because there was no dispute that the defendant was responsible for the victim's murder, the probative value of the statements was outweighed by the danger of unfair prejudice. Id. This court concluded that the victim's statements were not offered to prove the victim's mental state and were instead offered to prove the defendant's premeditation. Id. at *7. Noting that Rule 803(3) does not contemplate that the conduct of a third party is provable by this hearsay exception, this court held that the trial court erred in admitting these statements. Id. However, it concluded that because the evidence was overwhelming as

to the issue of premeditation, the trial court's error in admitting these statements was harmless. Id.

Although not cited by Pearman, we find State v. Stevens, 78 S.W.3d 817, 848 (Tenn. 2002) (appendix), and State v. Smith, 868 S.W.2d at 565, instructive on the issue of whether a victim's statements are relevant and admissible as rebuttal evidence. In Stevens, 78 S.W.3d at 823-28, the defendant was convicted of two counts of first degree premeditated murder and one count of especially aggravated robbery after the evidence at trial showed that he hired an eighteen-year-old to murder his wife and his mother-in-law and to steal certain items from his home. The trial court admitted the wife's diary to rebut the defendant's claims that there were no problems in the marriage. Id. at 847 (appendix). The Tennessee Supreme Court affirmed several issues decided by the Tennessee Court of Criminal Appeals, including the issue regarding the admission of the wife's diary, and attached the relevant portions of this court's opinion as an appendix. Id. at 845 (appendix). In determining this issue, the Court of Criminal Appeals held that a redacted version of the victim's diary, wherein the victim made statements regarding her fights with the defendant, her unhappiness with her marriage, and her thoughts of leaving the defendant, was relevant to rebut the defendant's claims that there were no problems in their marriage. Id. at 847 (appendix). It concluded that because the defendant claimed they had a strong marriage, his wife's diary, which contained her own statements about the marriage, was the "most probative evidence available to rebut the Defendant's claims" and that "the probative value of the diary was not substantially outweighed by the danger of unfair prejudice." Id. at 848 (appendix).

Likewise, in Smith, 868 S.W.2d at 565, the defendant was convicted of three counts of first degree premeditated murder of his estranged wife and stepsons. At trial, the defendant presented an alibi defense and claimed that although a divorce action was pending at the time of the murders, he and his wife had been reconciling. Id. at 566, 568. The defendant appealed, arguing that the trial court erred in admitting, over the defense's objection, testimony from the victim's father, sister, and friend that the victim had "expressed fear" of the defendant during their separation. Id. at 573. Although the defendant objected to this testimony on hearsay grounds, the trial court ruled that the testimony was admissible pursuant to the state of mind exception to the hearsay rule. Id. The Tennessee Supreme Court held that "[w]hile the evidence was admissible to show the declarant's state of mind, i.e., that the victim was afraid of the Defendant or had expressed fear of the Defendant during the period of the couple's separation, [the victim's] state of mind was not directly probative on the issue of whether the Defendant had murdered her and her sons." Id. As to the State's claim this testimony would be relevant to rebut the defendant's claim that he and the victim were reconciling, the court noted that the issue of reconciliation had not been raised by the defendant in his opening statement and any references to it in the defense's questioning may have been in response

to witnesses' testimony.  Id.  After recognizing that the defendant mentioned that he and his wife were reconciling in his statement to police, the court held that the victim's fear of the defendant was relevant to show the falsehood of this statement.  Ultimately, the court held that any error in admitting this testimony was harmless given the substantial proof of the defendant's prior threats and violent assaults on all three victims.  Id.

After considering the relevant law, we believe that the victim's statements regarding her plans to divorce Pearman and require him leave the home were relevant to rebut the following claims made by Pearman in his opening statement:

"The proof will show that they loved one another deeply."

"You'll hear proof about Carla Pearman during the months leading up to this—you'll hear proof that Carla Pearman was talking about having a baby with Jacob Pearman around Christmas season, after December 14[th] obviously."

"You'll hear that Mr. and Mrs. Pearman, Jacob's parents, on February 13[th], they had been out looking at houses for Jacob and Carla Pearman at Jacob's request.  Because they wanted to move out towards Spring Hill where his parents lived, so hopefully when they got Maddox back, that his parents could help with Maddox.  These are not the actions of someone who is premeditating a murder."

"You won't hear that [the victim] got up that morning [of February 13, 2013] and said you need to get out, you need to leave, I want you out. Because the truth is—and what the proof will show is that Ms. Pearman didn't want him to leave.  That's not what she wanted.  She wanted her husband and her son."

"You'll hear that Mr. Pearman said, if you want me to leave, I'll leave. And then [the victim] specifically said, I don't want you to leave."

"And during the period of time when the police had been to the house, you won't hear that Carla Pearman said, get him out of here, I have asked him to leave, he didn't leave.  When Ms. Stevens and Mr. Sidney Pearman were at the house, you won't hear that Ms. Pearman ever said, would you please get your son out of here, I need him to leave."

Pearman's opening statement made the portions of statements 1, 4, 5, 6, 7, 8, 9, 10, and 11, which dealt with the victim's intent to divorce Pearman and require him leave

the marital residence, extremely probative. In his opening statement, Pearman attempted to use the victim's purported indecision regarding the divorce to argue against premeditation. As a result, the victim's statements regarding her state of mind, specifically her intent to make Pearman leave, became relevant to rebut Pearman's claim that he and the victim loved one another, were planning to stay together, and were planning to have a child together at the time of the victim's death. While we acknowledge that these statements were somewhat prejudicial to Pearman, we nevertheless conclude that they were not unfairly prejudicial because Pearman placed the state of their relationship directly in issue. Because Pearman argued that the victim wavered about whether to end the marriage, the victim's statements regarding her intent to divorce Pearman and get him out of her house were the "most probative evidence available" to rebut Pearman's claims. Stevens, 78 S.W.3d at 848 (appendix).

Moreover, unlike Leming, the trial court in Pearman's case never instructed the jury that it could consider the victim's statements on the issue of premeditation. For these reasons, we conclude that these statements about divorcing Pearman and requiring him to leave the home were probative. We also conclude, given the contested issues in this case, that the probative value of these statements was not substantially outweighed by the danger of unfair prejudice. Even if the admission of these particular statements was error, Pearman has failed to show, in light of the evidence of premeditation, "that the error 'more probably that not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)) (citing State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001); State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999)). Accordingly, any error in admitting these statements was harmless.

Next, we must decide whether the trial court erred in admitting the portions of statements 2, 3, and 6, which dealt with the victim's fear of Pearman. Although Pearman did not specifically object to Mitch Ferguson's testimony in statement 3 and Ashley Fernandez's testimony in statement 6, Pearman did make a contemporaneous objection to the testimony by John Green in statement 2, who stated that the victim told him she was not going to return home and that she was scared to go home. Despite the State's claims, the record shows these statements were not offered to prove the victim's mental state but were instead offered to prove Pearman's premeditation. Because Rule 803(3) does not contemplate that a third party's conduct is provable by this hearsay exception, we conclude that the trial court erred in admitting these statements under the "state of mind" exception to the hearsay rule. However, because of the evidence of premeditation presented at trial, Pearman has again failed to establish "that the error 'more probably that not affected the judgment or would result in prejudice to the judicial process.'" See Rodriguez, 254 S.W.3d at 371-72; Smith, 868 S.W.2d at 575. Consequently, the admission of these statements was also harmless.

**V. Closing Argument.** Pearman contends that the State committed prosecutorial misconduct during its rebuttal closing argument by commenting on his right to remain silent and by asserting that he intended to kill the victim's parents after killing the victim. We conclude that Pearman is not entitled to relief.

Closing argument is a valuable privilege that should not be unduly restricted. State v. Dotson, 450 S.W.3d 1, 99 (Tenn. 2014). As a result, "attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Id. Nevertheless, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

First, Pearman claims that the prosecutor's remarks during rebuttal closing argument violated his right to remain silent and his right to a fair trial. At trial, Pearman repeatedly implied that M.T. received his injuries during wrestling practice. On appeal, he claims that it was improper for the prosecutor to state that "they have not offered one valid explanation for how those [injuries] could occur other than what that young man said happened to him on that witness stand."

The trial transcript shows that the prosecutor made the following comments during his rebuttal closing argument:

> But he had these injuries. . . . Injuries on his neck, on his stomach, his chest, and the back of his head. And he told you that [the defendant] kicked him, knocked him into the wall, and he choked him.
>
> And they want to you to believe that happened Monday night at a wrestling match. And I won't tell you not to accept that. But I will ask you this question. If it happened Monday night—and Monday night is what [the defendant] said to [the victim] when they were in that room at the Murfreesboro Police Department, and they were having this conversation— said something about the wrestling Monday night. So, that's the last time he wrestled.
>
> Nobody, nobody. Police officers, school teachers, after school workers. People at the MAC, his mother, nor [the defendant] saw any injuries. Nobody.

And I assume the Defense wants you to believe that those injuries were inflicted Monday night and laid [sic] dormant for two whole days, two and a half days, and showed up on Thursday morning when he ran away from home.

Or maybe they want you to say that the little boy choked himself and hit himself in the ribs and in the stomach and banged his head against the wall. Because <u>they have not offered one valid explanation for how those could occur other than what that young man said happened to him on that witness stand</u>.

The defense immediately objected, and the following exchange took place during the ensuing bench conference:

[Defense counsel]: Judge, I want to lodge an objection. It's an improper closing argument. We don't have any obligation to offer anything. And he is trying to flip the burden on the Defense by suggesting to the jury that we didn't offer any explanation, which we don't have to offer.

The Court: Thank you. Thank you. Overrule the objection. Thank you.

[Defense counsel]: Thank you.

The Court: Go ahead, [prosecutor].

The United States and Tennessee constitutions protect a defendant's right to remain silent. U.S. Const. amend. V; Tenn. Const. art. 1, § 9. "While closing argument is a valuable privilege that should not be unduly restricted, . . . comment upon a defendant's exercise of the state and federal constitutional right not to testify should be considered off limits to any conscientious prosecutor." <u>State v. Jackson</u>, 444 S.W.3d 554, 590 (Tenn. 2014) (internal citations and quotation marks omitted); <u>see</u> <u>State v. Thornton</u>, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) ("It is never proper for a prosecuting attorney to comment upon a defendant's decision not to testify."). Both direct and indirect comments on a defendant's failure to testify can violate the Fifth Amendment privilege. <u>Jackson</u>, 444 S.W.3d at 587.

Recently, the Tennessee Supreme Court outlined "a two-part test for ascertaining whether a prosecutor's remarks amount to an improper comment on a defendant's exercise of the constitutional right to remain silent and not testify." <u>Jackson</u>, 444 S.W.3d

at 587-88.  Under this test, this court must consider:  "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify."  Id. at 588.  Claims of impermissible prosecutorial comment on a defendant's right not to testify are reviewed de novo.  Id.  A prosecutor's comment on a defendant's right to remain silent is a non-structural constitutional error, and the State has the burden of establishing that the error is harmless beyond a reasonable doubt.  Id. at 591.  When determining whether the State has met its burden, this court "should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt."  Id.

Pearman specifically challenges the prosecutor's statement that "they have not offered one valid explanation for how those could occur other than what that young man said happened to him on that witness stand."  He asserts that this statement is nearly identical to statement in State v. Adam Wayne Robinson, No. 2013-02703-CCA-R3-CD, 2015 WL 3877705 (Tenn. Crim. App. June 23, 2015), which this court held to be a comment on the defendant's right not to testify.  In Adam Wayne Robinson, the prosecutor asked what the defendant and the minor victim were doing behind the apartment building and then asserted, "If they weren't doing what [the victim] said they were doing, what were they doing, because he hasn't offered any explanation for that through any of his witnesses."  Id. at *10.  The defense objected, and after a bench conference, the prosecutor then made the following statement:

> [The Defendant] obviously doesn't have to testify.  Everybody knows that, right.  We have all been told that since jury selection.  I'm not talking about his testimony.  I'm talking about the witnesses from the witness stand.  He chose to put on proof, and he didn't offer you any proof from any of those witnesses as to what else was going on and what he was doing with [the minor victim].

Id.  In determining whether these remarks amounted to a comment on the defendant's right to remain silent, the court reiterated that "'a prosecutor's comments on the absence of any contradicting evidence may be viewed as an improper comment on a defendant's exercise of the right not to testify when the defendant is the only person who could offer the contradictory proof.'"  Id. at *11 (emphasis added) (quoting Jackson, 444 S.W.3d at 586 n.45).  It then observed that only the defendant could have offered proof to rebut the minor victim's testimony about what happened behind the apartment building because no one else was present at the time of the alleged offense.  Id.  The court, noting that "the prosecutor's argument directly referenced the [d]efendant's failure to testify several times and implicitly invited the jury to use the [d]efendant's silence as a tacit admission of

- 32 -

guilt," held that the prosecutor's remarks violated the defendant's constitutional right not to testify. Id. The court also held that the prosecutor's remarks were not harmless beyond a reasonable doubt because numerous direct and indirect references to the defendant's failure to testify were made, a curative jury instruction was not given, and the evidence of defendant's guilt was not overwhelming. Id.

Pearman claims that in his case, just as in Adam Wayne Robinson, the prosecutor's remark amounted to an unconstitutional comment on his right to remain silent. As support for this contention, Pearman asserts that the trial court gave no curative instruction to the prosecutor's remark and that no witnesses other than Pearman and the child could have testified regarding the source of the injuries. He also emphasizes that because the prosecutor's improper comment was made during the State's rebuttal closing argument, he was without an opportunity to defend himself.

Initially, we note that "prosecutorial responses to defense arguments are clearly permitted[.]" Jackson, 444 S.W.3d at 587; see State v. Sutton, 562 S.W.2d 820, 823-24 (Tenn. 1978) ("Where the criminal defendant raises an issue in his defense, he cannot complain of references to the issue by the prosecution, or argument on that issue, so long as the argument is fairly warranted by the facts and circumstances of the case."); State v. Rice, 638 S.W.2d 424, 427 (Tenn. Crim. App. 1982) ("Generally, mere argument by the state that its proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify."). In Pearman's case, there is no proof that the prosecutor's manifest intent was to comment on his right not to testify when he challenged the defense's theory that M.T. received his injuries from wrestling practice. See Jackson, 444 S.W.3d at 588. The prosecutor's comments and behavior in Pearman's case were not "as direct or animated as those of the prosecutor in Jackson." State v. Colvett, 481 S.W.3d 172, 208 (Tenn. Crim. App. 2014). The prosecutor never demanded that Pearman explain himself and never reminded the jury that Pearman had the right not to testify.

Instead, the prosecutor merely highlighted the fact that no one had observed any injuries to M.T. after his wrestling practice on Monday night. Unlike Adam Wayne Robinson, multiple individuals, other than Pearman and M.T., were in a position to know whether M.T. had been injured at wrestling practice. The trial transcript shows that the defense, on cross-examination and in its closing argument, repeatedly suggested that M.T. received his injuries at wrestling practice, and the prosecutor's comments during closing were merely a response to this defense theory rather than a comment on Pearman's right to remain silent. Accordingly, we also conclude that the prosecutor's comments were not of such a character that the jury would necessarily have taken them to be a comment on the defendant's failure to testify. See Jackson, 444 S.W.3d at 588.

- 33 -

Second, Pearman contends that the prosecutor's remarks during rebuttal closing argument about his intent to kill the victim's parents were improper. He asserts that these comments misled the jury about the inferences that could be drawn from the evidence, were calculated to inflame the passions of the jury, and argued facts outside the record. The State concedes that the prosecutor's comments were improper but asserts that they were harmless in light of the curative instruction given by the trial court. While we agree that these comments were extremely improper and careless, we nevertheless conclude, in light of the trial court's curative instruction and the evidence of Pearman's guilt, that these comments did not negatively affect the verdict in this case.

During rebuttal closing argument, the prosecutor made the following comments:

[The State]:                    The one thing we won't ever know is why Manchester? Why get in your car and drive to Manchester? Who lived down there? His parents lived in Columbia. Completely out of the way to be going to their home.

I'll tell you who lived down there. [The victim's] parents, who had been a big problem in this relationship. They were causing friction. Remember that? You remember him saying that up there at the police department on the child abuse? Your parents have been coming between us. They are probably telling the little boy what to say. They are probably the ones that have stirred all this up. And then he drives to the very city where they live. . . .

But he looked for his gun. He couldn't find it. Gets in the car—oh, I'm sorry. He put a bag over his head to try to kill himself. You remembered that. The bag with Carla's DNA on it, and maybe his. But he can remember all of that.

And I submit to you he got down there and had all of this time to think about what to do, and decided I don't have a gun, how am I going to kill them. Doubt they'll sit still while I put a bag over their head.

[Defense Counsel]: Objection. Judge, may we approach?

- 34 -

| The Court: | Yes, sir. |
|---|---|
| [The State]: | I'll withdraw it, Your Honor. |
| [Defense Counsel]: | No. |
| The Court: | I'll sustain the objection. Thank you, [Defense Counsel]. Ladies and Gentlemen, I have sustained the objection. You are to strike the last comments made by [the State] from your mind. You may not refer to them later during your deliberations. Thank you. |

Immediately thereafter, defense counsel during a bench conference made a motion for a mistrial, arguing that the prosecutor had "put facts in his argument that are way outside reasonable inferences from the proof." The trial court denied this request, holding that its curative instruction to disregard the remarks was sufficient.

This court has recognized that there are five general categories of prosecutorial misconduct:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6.

Here, the State concedes that the prosecutor's comments were improper. "When evaluating an improper prosecutorial argument that does not rise to the level of a constitutional violation, the test to be applied is 'whether the improper conduct could have affected the verdict to the prejudice of the defendant.'" Jackson, 444 S.W.3d at 591 n.50 (quoting Harrington v. State, 385 S.W.2d 758, 759 (1965)). In making this determination, we should consider the following five factors:

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

Id.; see Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Pearman analyzes the effect of this comment under the Judge factors. We agree that "the Judge factors should only be applied to claims of improper prosecutorial argument" and should not be applied to claims of unconstitutional prosecutorial comment. Jackson, 444 S.W.3d at 591 n.50. Moreover, while "the State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, . . . a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id. Lastly, we recognize that "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." State v. Banks, 271 S.W.3d 90, 131 (Tenn. 2008).

Pearman contends that the prosecutor's comment was extremely prejudicial because the State's proof of premeditation was not overwhelming. Although Pearman acknowledges that the trial court provided a curative instruction, he asserts that the prosecutor's remark "was so prejudicial and so far afield" that the curative instruction "was not enough to remove the taint of the improper argument." He also claims that while the prosecutor's intent in making the comment is not "entirely discernable," the comment had "no other purpose than to inflame the passions of the jury." Pearman argues that this error, when combined with the prosecutor's comment on his right not to testify and the other errors, resulted in a cumulative effect requiring relief.

- 36 -

In this case, after the defense objected, the prosecutor realized his mistake and offered to withdraw the statement. The trial court sustained the objection and immediately provided a curative instruction to the jury to disregard that portion of the State's argument. The trial court's preliminary instructions asserted that statements of attorneys are not evidence, and its final instructions emphasized that statements, arguments, and remarks of counsel are not evidence and that if such statements were not supported by the evidence, then the jury should disregard them. It is well established that juries are presumed to follow the instructions of the trial court. Banks, 271 S.W.3d at 137; State v. Reid, 164 S.W.3d 286, 346 (Tenn. 2005). While we are unsure of the prosecutor's intent in making this wildly inappropriate remark, we feel that this was the only improper comment made by the prosecution during its closing arguments and that the other issues raised by Pearman did not constitute errors. Most importantly, we have already concluded that the proof of premeditation in this case was sufficient to sustain his conviction. For all these reasons, we conclude that Pearman has failed to show that the prosecutor's remark affected the verdict in this case to his prejudice.

**VI. <u>Thirteenth Juror.</u>** Pearman argues that the trial court failed to properly exercise its role as the thirteenth juror. Specifically, he claims that the weight of the evidence preponderated against the jury's verdict finding him guilty of first degree premeditated murder and that the trial court, sitting as the thirteenth juror, should have set aside the jury's verdict and granted him a new trial on this charge.

Pearman claims the evidence showed that he was not sufficiently free from passion and excitement at the time of the victim's death to be capable of premeditation. As support, he references his own statement to police as well as his mother's testimony, which established that at the time of the victim's death, he was under the stress of his disclosure of his rape as a child, his pending child abuse charges, and his court appearance the next day. He reiterates that none of the victim's hearsay statements he challenged should have been used to determine whether he acted with premeditation and that the remaining evidence failed to show that he formed the intent to kill the victim prior to the act itself.

Tennessee Rule of Criminal Procedure 33(d) provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Rule 33(d) "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Only if the record contains statements by the trial court expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict or indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror may an appellate court reverse the trial court's judgment. State v. Carter,

896 S.W.2d 119, 122 (Tenn. 1995). Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Tennessee Rule of Appellate Procedure 13(e). State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court concludes that the trial court failed to fulfill its duty as the thirteenth juror, the appropriate remedy is to grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

Here, after the jury returned its verdict, the trial court made the following unambiguous statement approving the jury's verdict: "The Court has polled the jury. The Court, acting as the 13th juror, would approve the verdict of the jury. Finds that it conforms or comports to the evidence as presented at trial." The record shows that the trial court never expressed any disagreement with the verdict or dissatisfaction with the weight of the evidence. See Carter, 896 S.W.2d at 121. As we will explain in the next section, the evidence was more sufficient to sustain Pearman's conviction for first degree premeditated murder. Because the record shows that the trial court considered the evidence as the thirteenth juror and clearly approved the jury's verdict as to the first degree premeditated murder charge, Pearman is not entitled to relief on this issue.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE